IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ADAMS OUTDOOR ADVERTISING LIMITED
PARTNERSHIP,

                          Plaintiff,                          OPINION and ORDER

        v.
                                                             17-cv-576-jdp

CITY OF MADISON and MATTHEW TUCKER,

                          Defendants.

---

The City of Madison strictly regulates billboards, banning them in the city center and limiting them elsewhere. Plaintiff Adams Outdoor Advertising Limited Partnership would like to modernize its billboards and build more, but it can't under Madison's sign ordinance. Adams Outdoor has challenged the ordinance several times before; this is the latest such challenge.

Adams Outdoor is suing Madison and its zoning administrator, Matthew Tucker, alleging that Madison's sign ordinance is unconstitutional on numerous grounds. But its primary claim is that the ordinance violates the First Amendment by drawing content-based distinctions between billboards and other kinds of signs, relying chiefly on the Supreme Court's 2015 decision in *Reed v. Town of Gilbert*. Both sides move for summary judgment. Dkt. 61; Dkt. 70.

Adams Outdoor's claims are mostly ones that it brought, or could have brought, in a prior lawsuit against the city, so most of its claims are precluded. But even if they weren't, Adams Outdoor's claims would fail on the merits. Whether the Capitol Square should look like Times Square is a decision that Madison city government is entitled to make, even after *Reed*. The court discerns no constitutional infirmity in Madison's sign ordinance, so the court will grant summary judgment to the city and dismiss the case.

UNDISPUTED FACTS

The material facts are undisputed.

Plaintiff Adams Outdoor Advertising is an outdoor advertising company that owns and operates billboards throughout the state of Wisconsin. It owns 90 billboard structures in Madison containing 186 billboard faces. Adams leases those faces to clients, who use them to display a wide variety of commercial and noncommercial messages.

Defendant Matthew Tucker is the zoning administrator for the city of Madison. He is responsible for interpreting and enforcing Madison's sign ordinance, which is codified at Chapter 31 of the Madison General Ordinances.

## A. Madison's sign ordinance

Chapter 31 regulates all manner of signs, ranging from decorative banners and murals to "business opening signs" and "condominium identification signs." The purpose of Chapter 31, as set out in its purpose and intent section, is to promote "public safety and aesthetic values." Madison. Gen. Ord. § 31.02(1).

Under Chapter 31, billboards (which the ordinance calls "advertising signs") are subject to stricter regulation than other types of signs. In 1989, the city passed an ordinance requiring removal of advertising signs from certain areas of downtown and imposing a prospective ban on the construction of new or replacement advertising signs anywhere in the city. Those advertising signs remaining after the 1989 ordinance are categorized as non-conforming uses, and they may not be "relocated, replaced, expanded, enlarged, repositioned or raised in height," except in certain limited circumstances. § 31.05(2)(b). By contrast, Chapter 31 allows other types of signs (such as "business signs" or "ground signs") to be erected, relocated, repaired, or altered so long as the sign owner first obtains a permit from the zoning administrator. *See*

§ 31.041. Still other types of signs (such as "athletic field signage" and "election campaign signs") may be erected without a permit at all. *See* § 31.044.

The ordinance limits advertising signs to certain zoning districts within the city, and it subjects them to strict setback, height, net area, and other spacing requirements. § 31.11. No other type of sign regulated by the ordinance is subject to these restrictions. And whereas owners of other types of signs may seek variances from strict application of ordinance requirements through a process known as "comprehensive design review," advertising signs are generally ineligible for that process. § 31.043(4)(b)(5).

The city will allow the replacement or relocation of an advertising sign under limited circumstances. For instance, advertising signs may be realigned (that is, relocated on the same site) if necessary to accommodate a Wisconsin Department of Transportation highway project. § 31.05(2)(c). Advertising signs may be restored or reconstructed if they are "damaged or destroyed by fire or other casualty or act of God," but only if the total cost of the restoration doesn't exceed certain limits. § 31.04(2)(b). And under the city's "advertising sign bank" program, which the city established in 2015, owners of qualifying advertising signs that must be removed due to redevelopment projects may "bank" the net area of the removed sign and then apply for a permit to construct a replacement advertising sign elsewhere in the city. *See* § 31.112. The ordinance imposes a higher per-square-foot permit fee for advertising signs ($2.50 per square foot) than it does for other types of signs that require permits ($1.75 per square foot). § 31.041(3)(a).

In addition to its advertising sign-specific regulations, the ordinance contains a blanket prohibition on digital image signs—that is, signs that incorporate technology that displays illuminated digital images. § 31.045(3)(i).

**B. Adams Outdoor's challenges to Chapter 31**

Over the years, Adams Outdoor has filed multiple lawsuits against the city, including most notably one in 1990, which the city and Adams Outdoor settled with a comprehensive agreement. The specific events giving rise to the current litigation began in 2016, when Adams Outdoor began submitting applications for sign permits that were disallowed by the terms of the ordinance.

**1. Adams Outdoor applies for sign replacement credits through the advertising sign bank program**

Adams Outdoor operates a billboard at 615 Forward Drive, on property owned by a local television station. The owners of that station constructed a new facility that partially obstructed the view of Adams Outdoor's billboard. So in 2016, Adams Outdoor sought to remove the sign and bank its net area through the advertising sign bank program. Tucker denied Adams Outdoor's application for sign replacement credit after determining that the billboard in question didn't meet the program's strict eligibility criteria. Although the new development partially obstructed Adams Outdoor's sign, the sign was not located in the same physical space as the new facility, nor was it so close to the facility that it would result in a building code violation. *See* § 31.112(2)(b)(3). Adams Outdoor could have appealed Tucker's decision to the Urban Design Commission, the deliberative body that considers appeals of decisions made by the zoning administrator, but it chose not to do so. Adams Outdoor's billboard remains at its original location, now partially obstructed by a building.

**2. Adams Outdoor applies for permits to modify or replace existing billboards**

In April 2017, Adams Outdoor submitted 26 applications to the city seeking to modify or replace existing billboards. Adams Outdoor expected the applications to be denied because they proposed modifications that contravened the terms of the ordinance. In June, Tucker

denied 25 of the 26 permits, citing the various ordinance provisions that Adams Outdoor's proposed modifications would violate. *See* Dkt. 93, ¶ 47. Tucker determined that the proposed modifications would violate the general ban on new, relocated, or replacement advertising signs in §§ 31.05(2) and 31.11(1). He also identified other ordinance provisions that supported the permit denials, including height and size restrictions, setback rules, zoning conditions, and the prohibition on the use of digital displays.

In July 2017, Adams Outdoor filed this lawsuit in federal court. Adams Outdoor also appealed 22 of the 25 denials to the Urban Design Commission. Rather than contesting specific factual errors that Tucker made in reviewing the permit applications, Adams Outdoor asserted that the ordinance was unconstitutional. When the Urban Design Commission denied the appeals, Adams Outdoor sought review in the Dane County Circuit Court. *See Adams Outdoor Advertising Ltd. P'ship v. City of Madison*, No. 17-cv-2754 (filed Nov. 11, 2017). The state-court case has been stayed pending resolution of this case.

## C. 2017 amendments to the sign ordinance

In December 2017, the common council made several amendments to Chapter 31. The amendments were prompted by Adams Outdoor's litigation as well as a 2015 Supreme Court case, *Reed v. Town of Gilbert*, --- U.S. ----, 135 S. Ct. 2218 (2015). *See* Dkt. 75-2, at 2, 3. The amendments themselves were minor. As relevant here, definitions for the terms "commercial message" and "noncommercial message" were deleted from the ordinance's definitions section, and references to "noncommercial messages" were excised from the ordinance's definition of "advertising sign." The amended ordinance defines advertising sign as a "sign containing a commercial message directing attention to a business, commodity, service, or entertainment, not related to the premises at which the sign is located, or directing attention to a business,

commodity, service or entertainment conducted, sold or offered elsewhere than on the premises where the sign is located."

ANALYSIS

Adams Outdoor challenges the constitutionality of Madison's sign ordinance on several grounds. But its core argument is that the city's regulation of billboards depends on content-based distinctions that are subject to strict scrutiny under *Reed v. Town of Gilbert*. For reasons explained more fully in the body of this opinion, the court is not persuaded that *Reed* represents the radical shift in First Amendment law that Adams Outdoor suggests. *Reed* leaves intact the general framework for evaluating restrictions on commercial speech in *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*, 447 U.S. 557 (1980), and for evaluating billboard regulation in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981). Regulations based on the distinctions between commercial and non-commercial speech, and between on-premises and off-premises signs, are not content-based distinctions, and they are subject only to intermediate scrutiny under *Central Hudson* and *Metromedia*.

The dispositive issues in this case are legal ones, and the material facts are undisputed. Accordingly, the case is appropriately resolved on summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which both sides have requested as to the merits. As with any summary judgment motion, the court reviews these cross-motions "construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party." *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007) (citation and alteration omitted).

This opinion is divided into three main sections. First, the court will consider the city's challenges to Adams Outdoor's standing. Second, the court will consider whether Adams Outdoor's claims are barred under the doctrine of claim preclusion as a result of its 1993 settlement with the city. Third, the court will consider the merits of Adams Outdoor's constitutional claims.

## A. Standing

One of the jurisdictional prerequisites to filing a lawsuit in federal court is standing to sue under Article III of the Constitution. To demonstrate standing, the plaintiff must show that it has suffered (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *See Spokeo, Inc. v. Robins*, --- U.S. ----, 136 S. Ct. 1540, 1547 (2016). The city doesn't dispute that Adams Outdoor has standing to assert as-applied challenges to the billboard regulations implicated in the denial of its permit requests in 2016 and 2017. Dkt. 100, at 8. And the court agrees with that assessment. Being denied a permit to engage in speech is an injury in fact, *see Chicago Joe's Tea Room, LLC v. Vill. of Broadview*, 894 F.3d 807, 814 (7th Cir. 2018), the denial is fairly traceable to the city ordinance, and striking down the ordinance would redress the injury.

The city raises two narrower challenges to Adams Outdoor's standing. First, it says that Adams Outdoor lacks standing to challenge aspects of the ordinance that don't relate to Adams Outdoor or its business. Second, it says that Adams Outdoor lacks standing to assert claims that the billboard ban is facially unconstitutional. (The city also contends that Adams's claim for damages dating back to 1990 is unripe, Dkt. 76, at 17–20, but the court need not consider any damages issues because the court is granting summary judgment to the city on liability.)

The court agrees that Adams Outdoor does not have standing to challenge parts of the ordinance that don't affect it. But Adams Outdoor has standing to bring a facial challenge.

### 1. Provisions in the ordinance with no bearing on Adams Outdoor

Adams Outdoor is challenging many parts of the ordinance, some of which don't appear to have any effect on Adams Outdoor or its business. Adams Outdoor parses the sign ordinance's definitions section, § 31.03(2), for definitions that it alleges are unconstitutionally content based. For example, Adams Outdoor challenges the ordinance's definition of terms such as "condominium identification sign," "menu or merchandise board," and "mural," even though it does not seek to erect these kinds of signs.[1] Then Adams Outdoor challenges ordinance provisions that regulate these types of signs. Among other things, it says that the comprehensive design review process, which is meant to help facilitate variances for signs other than advertising signs, *see* § 31.043(4), poses an unconstitutional prior restraint on the speech of the owners of those signs. It says that the ordinance is unconstitutionally vague because it fails to give sign owners sufficient notice about what differentiates "electronic changeable copy signs" from "digital image signs," even though it is undisputed that Adams may install neither type of sign on its billboards. It also points out various ordinance provisions that it says are unconstitutionally content-based, such as its provisions exempting signs on city-owned bicycle-sharing facilities from the regulations generally governing advertising signs.

---

[1] Adams Outdoor also challenges the following definitions that aren't related to its business: "accessory sign," "banner promotional," "building entrance identification sign," "business sign," "identification sign," "logo," "off-premises directional sign," "political sign," "project sign," "real estate sign," "street occupancy sign," "subdivision identification sign," and "time and/or temperature sign." Dkt. 62, at 23–25.

Adams Outdoor doesn't have standing to challenge the entire ordinance simply because the city has relied on some provisions in denying permits to Adams Outdoor. "[S]tanding is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). "Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citations and quotation marks omitted). Adams doesn't explain how it is injured by provisions that don't apply to it or relate to its business. Certainly, the manner in which the city regulates other types of signs *as compared to advertising signs* is relevant to Adams's content-based discrimination claims. But that doesn't give Adams "a passport to explore the constitutionality of every provision of the Sign [Ordinance.]" *Covenant Media of SC, LLC v. City of N. Charleston*, 493 F.3d 421, 429 (4th Cir. 2007). The court will not evaluate the constitutionality of ordinance provisions that don't apply to the signs that Adams Outdoor wishes to erect.

## 2. Facial challenge to the billboard ban

Adams Outdoor has standing to raise a facial challenge to the ordinance's ban on billboards. The analysis is straightforward: if Adams Outdoor could persuade the court to strike down the ban entirely, that would redress its injury in being denied permits, just as would more targeted challenges to specific provisions in the ordinance.

The city argues for the opposite conclusion, contending that striking down the billboard ban won't redress Adams Outdoor's injuries because the city had other reasons for denying Adams Outdoor permits, including time, place, and manner restrictions such as setback requirements, height restrictions, and the prohibition on digital displays. The city relies on *Harp Advertising Illinois, Inc. v. Vill. of Chicago Ridge*, 9 F.3d 1290 (7th Cir. 1993), in which the court held that an outdoor advertising company's claims were not redressable because the sign

it wished to erect violated size restrictions that the company had not challenged. But *Harp* is distinguishable because Adams Outdoor is challenging both the billboard ban *and* the time, place, and manner restrictions. It may be true that Adams Outdoor must successfully challenge both types of restrictions to prevail on the merits, but that doesn't mean that Adams Outdoor lacks standing to assert a facial challenge. *See United States v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 818 (7th Cir. 2013) ("[T]o have standing, a claimant need not establish that a right of his has been infringed; that would conflate the issue of standing with the merits of the suit." (internal quotations omitted)). The city cites a Ninth Circuit case that appears to take the opposite view. *See Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 893, 894 (9th Cir. 2007). But the Seventh Circuit has never endorsed such an approach so the court will not employ it here.

## B. Claim preclusion

At the court's request, the parties filed supplemental briefs to address the city's claim preclusion affirmative defense. *See Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008) ("[It was not] improper for the district judge to invoke res judicata even though the defendants had failed to argue it. The doctrine is not based solely on the defendant's interest in avoiding the burdens of twice defending a suit, but is also based on the avoidance of unnecessary judicial waste." (internal quotations omitted)). The question raised in the supplemental briefs is whether a 1993 stipulated judgment between Adams Outdoor and the city bars some or all of the claims that Adams Outdoor is raising in this case. As it turns out, it wouldn't be necessary to address claim preclusion because all of Adams Outdoor's claims fail on the merits, for reasons explained below. But the court will also explain why much of this lawsuit is barred by the 1993 stipulated judgment.

The settlement and stipulated judgment arose out of an inverse condemnation lawsuit that Adams Outdoor filed against the city in state court in 1990 after the city amended its sign ordinance and required Adams Outdoor to remove some of its billboards. Adams Outdoor sought compensation for the removal of its billboards, and it challenged the billboard ban itself under the First Amendment. Under the terms of the agreement settling the lawsuit, the city allowed Adams sixteen billboard permits, and the parties agreed that the "causes of action and any and all claims or causes of action which have been brought or which could have been brought, founded upon the facts which are the subject of this action . . . may be dismissed upon the merits, with prejudice" following formal approval by the common council. Dkt. 71-2, at 3.

Because Adams Outdoor filed the 1990 lawsuit in state court, Wisconsin law determines whether the 1993 settlement has preclusive effect in this case. *See Wilhelm v. Cty. of Milwaukee*, 325 F.3d 843, 846 (7th Cir. 2003); 28 U.S.C. § 1738. In Wisconsin, as in most jurisdictions, claim preclusion bars "all subsequent actions between the same parties as to all matters which were litigated or which might have been litigated in the former proceedings." *Teske v. Wilson Mut. Ins. Co.*, 2019 WI 62, ¶ 23, 387 Wis. 2d 213, 225, 928 N.W.2d 555, 561 (2019) (quoting *Lindas v. Cady*, 183 Wis. 2d 547, 558, 515 N.W.2d 458 (1994)). There are three elements: (1) a final judgment on the merits; (2) an identity of the causes of action in the two lawsuits; and (3) an identity between the parties or their privies in the prior and present lawsuits. *Id.* ¶ 25. The parties agree that the third element is established, so the court will focus on the other two.

### 1. Final judgment on the merits

A "stipulated judgment (as a result of a settlement) on the merits *may have* the same preclusive effect as a claim litigated to conclusion." *Wis. Pub. Serv. Corp. v. Arby Const., Inc.*,

2012 WI 87, ¶ 64, 342 Wis. 2d 544, 566, 818 N.W.2d 863, 875 (2012) (emphasis added). In *Wisconsin Public Service*, the court gave preclusive effect to a stipulated judgment because it provided for all claims "to be dismissed with prejudice." *Id.* ¶ 65. Wisconsin thus appears to follow the general approach under which stipulated judgments have a "basically contractual nature." Charles Alan Wright & Edward H. Cooper, 18A Federal Practice and Procedure: Jurisdiction § 4443 (3d ed. 2017). As a result, their preclusive effect depends on the intent of the parties, but as with a contract "an objective manifestation of intent may support preclusion that was not subjectively intended." *Id.*

Here, the 1993 stipulation was unambiguous: "any and all claims or causes of action which have been brought or which could have been brought" were "dismissed upon the merits, with prejudice." Doc. 71-2, at 3. That language is decisive under an objective test. Resisting this conclusion, Adams points to statements by the presiding judge about the effect of the settlement to amendments to the ordinance. *See, e.g.*, Dkt. 103-10, at 8–9 ("[T]o the extent that [the city] make[s] a change that Adams or somebody else believes is invalid or improper in some legal sense, anybody's free to challenge that change when it's made."). The court will discuss the legal effect of amendments since 1993 in the next section. But nothing in the settlement itself suggests that the parties intended the settlement to be nullified if the city made any amendments to the ordinance, so the judge's statements aren't probative for the purpose of determining the preclusive effect of the stipulated judgment. The court concludes that the city has satisfied this element.

### 2. **Identity of the causes of action**

To determine whether there is an identity of the causes of action, Wisconsin courts have adopted the "transactional approach" set forth in the Second Restatement of Judgments.

*See Teske*, 2019 WI 62, ¶ 31 (citing Restatement (Second) of Judgments § 24 (1982)). "Pursuant to this analysis, 'all claims arising out of one transaction or factual situation are treated as being part of a single cause of action and they are required to be litigated together.'" *Id.* (quoting *A.B.C.G. Enters., Inc. v. First Bank Se., N.A.*, 184 Wis. 2d 465, 481, 515 N.W.2d 904, 910 (1994)). The underlying facts, not the plaintiff's legal arguments, define the scope of a transaction: "the number of substantive theories that may be available to the plaintiff is immaterial—if they all arise from the same factual underpinnings they must all be brought in the same action or be barred from future consideration." *N. States Power Co. v. Bugher*, 189 Wis. 2d 541, 555, 525 N.W.2d 723, 729 (1995).

Both this case and the 1990 lawsuit involve First Amendment challenges to the city's sign ordinance. *Compare* Dkt. 105-1, at 9–11 (Adams's April 19, 1990 complaint), *with* Dkt. 17, at 17–25 (Adams's April 16, 2018 amended complaint in this action). But Adams Outdoor contends that the two lawsuits don't arise out of the same transaction for two reasons: (1) the 1990 litigation concerned only the narrow issue of whether the city could renege on an earlier promise to let Adams relocate sixteen billboards; and (2) the city has amended the ordinance multiple times between 1993 and the present.[2]

Adams Outdoor's first contention is based on a misunderstanding of the relevant standard. Under the transactional approach, a plaintiff must present in the first lawsuit "all

---

[2] Adams Outdoor doesn't rely on *Whole Woman's Health v. Hellerstedt*, --- U.S. ----, 136 S. Ct. 2292, 2305 (2016), in which the Court held that "[f]actual developments" in cases involving "important human values" may give rise to a new claim for the purpose of determining whether claim preclusion should apply to a second challenge to a statute. Because Adams Outdoor doesn't contend that the facts of this case meet the standard in *Whole Woman's Health*, the court doesn't consider that issue.

material relevant to the transaction without artificial confinement to any substantive theory or kind of relief." *N. States Power Co.*, 189 Wis. 2d at 555, 525 N.W.2d at 729 (quoting *DePratt v. W. Bend Mut. Ins. Co.*, 113 Wis. 2d 306, 312, 334 N.W.2d 883, 886 (1983)). Under both Wisconsin law and the language of the stipulated judgment, the question is whether Adams Outdoor could have brought the same challenge in 1990 that it brings today.

In any event, the original 1990 complaint targeted the billboard ban generally, not just the sixteen billboards. To remedy alleged First Amendment violations, Adams sought "an order declaring unconstitutional, as applied, the amendment to Madison's street graphic control ordinance which purports to ban new or replacement outdoor advertising signs." Dkt. 105-1, at 10. So, for purposes of the preclusion analysis, the 1990 case was not limited to the 16 billboards that Adams Outdoor sought to relocate.

Adams Outdoor's second contention—that claim preclusion doesn't apply because the city has amended the ordinance—has two parts. First, Adams Outdoor says that gaps in the historical record make it impossible to determine the content of the ordinance in 1993. Second, it says that the changes to the ordinance created a new transaction and a new claim.

### a.  Gaps in the historical record

As a threshold matter, Adams contends that it is too difficult to determine whether their claims are precluded because of uncertainty about the version of the ordinance at issue during the 1990 litigation and because certain litigation documents are missing. But a review of the records the parties have provided leaves little doubt about what was or could have been challenged in 1990.

First, the city has provided complete ordinance versions in effect at the time. Granted, the city had to "reconstruct" the ordinance as it existed in 1990 by "tracking down" the history

of amendments. Dkt. 103-8, at 2. But whatever obstacles the city faced in pulling the relevant records together, it ultimately produced copies of the sign ordinance as it existed on April 19, 1990, and December 21, 1993, along with copies of ten ordinance amendments enacted by the common council during the interim period. *See* Dkt. 104, ¶¶ 3–6 (declaration of Diane Althaus); Dkt. 104-1 (1990 ordinance); Dkt. 104-2 (1993 ordinance); Dkt. 104-3 (interim amendments). The city explained its compilation process in detail, *see* Dkt. 104, ¶¶ 2, 5, and Adams has given no reason to doubt the accuracy or authenticity of these documents. The documents show that all versions of the ordinance potentially at issue in that litigation were materially identical in their treatment of billboards.[3]

Adams also suggests that a "second amended petition" and "rulings on the constitutionality of the ordinance" are missing from the litigation records. Dkt. 102, at 7. (Adams infers that such documents existed because they are mentioned in a February 16, 1993 letter from Adams's then-counsel to a Dane County Circuit Court judge. *See* Dkt. 103-9.) But even without the benefit of those documents, the record shows that Adams could have brought, and in fact did bring, a First Amendment challenge to the sign ordinance in 1990. And then the 1993 stipulation dismissed all claims that were brought or "could have been brought" by Adams. Dkt. 71-2, at 3. So the court rejects Adams Outdoor's contention that the historical record isn't clear enough to determine whether the 1993 stipulated judgment precludes Adams Outdoor's claims in this case.

---

[3] There was only one substantive amendment between 1990 and 1993. In August of 1990, the common council added a "message substitution" provision at § 31.04(1)(c), providing that "[a]ny street graphic authorized in this chapter is allowed to contain any noncommercial message in addition to or in lieu of any other message." Dkt. 104-3, at 5. But since construction, relocation, and replacement of billboards was at all times proscribed, this amendment would not have affected Adams's advertising business or its claims against the city.

### b. Amendments to the sign ordinance

The next question is whether the sign ordinance has changed since 1993 in ways that give rise to a new transaction. The parties don't cite any Wisconsin case law on this issue, and the court hasn't uncovered any that is on point. Again, however, the general question is whether Adams Outdoor is raising claims in this case that it could have raised in the 1990 lawsuit. *N. States Power*, 189 Wis. 2d at 550. Another way of posing that question is whether the "operative facts in both the [old] and [new] claims are the same." *Kruckenberg v. Harvey*, 2005 WI 43, ¶¶ 29-30, 279 Wis. 2d 520, 534–35, 694 N.W.2d 879, 887. Applying this general concept, the Court of Appeals for the Seventh Circuit has held under federal common law that claim preclusion "is inapplicable when a statutory change creates a course of action unavailable in the previous action." *Alvear-Velez v. Mukasey*, 540 F.3d 672, 678 (7th Cir. 2008) (collecting cases). So, in the context of this case, the question is whether the city has amended the ordinance in a way that would give rise to a constitutional claim that Adams Outdoor could not have raised in the 1990 litigation.

#### i. Non-substantive changes

Some of the changes Adams Outdoor challenges are stylistic rather than substantive. For example, in 2009 the city replaced the word "street graphic" with "sign," Dkt. 103-13, and in 2013 the city renamed certain zoning districts, Dkt 103-15. None of these changes affected the constraints the sign ordinance imposed on Adams's business activities or otherwise gave rise to a new claim.

#### ii. 2009 amendment

In 2009, the city added a general prohibition on "digital image signs" to the ordinance. There was no such provision in 1990, before digital sign technology became ubiquitous. The

1990 version of the ordinance did include an analogous prohibition on "flashing, motion street graphics and displays" as well as the use of "any motion picture machine, projected images or stereopticons" in connection with a sign. Dkt. 104-1, § 31.04(6)(d), (6)(j). But even if the court assumes that the substantive scope of the two provisions is the same, the court doesn't have enough information to determine whether Adams Outdoor could have challenged the 1990 provision.

In 1990, Adams Outdoor didn't have any digital signs or moving graphics and it wasn't asking the city for permission to put up those kinds of signs. And if Adams Outdoor wasn't intending to expand its business to include those signs, it wouldn't have standing to challenge restrictions on those signs. *See Covenant Media*, 493 F.3d at 429; *see also Texas v. United States*, 523 U.S. 296 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."). Because neither side has adduced any evidence on Adams Outdoors' plans in 1990, the court cannot say whether Adams Outdoor could have challenged the 1990 bans on moving graphics. And because the city has the burden to prove its affirmative defense, the court will not dismiss Adams Outdoor's challenge to the 2009 digital sign prohibition under the doctrine of claim preclusion.

### iii. 2015 amendments

In 2015, the city created the advertising sign bank program, which allows owners of advertising signs removed due to redevelopment to obtain credits that they can use to erect replacement signs. Rather than inflicting new wrongs or exacerbating old ones, the advertising

sign bank program mitigated the burden of the billboard ban by giving Adams flexibility when its signs are affected by outside development projects.

### iv. 2017 amendments

In 2017, the common council amended the definition of "advertising sign" to eliminate its reference to noncommercial speech,[4] and eliminated "commercial message" and "noncommercial message" from the ordinance's definitions section. Although notes accompanying the legislative file acknowledged that the amendments were made on the advice of legal counsel "concerning strategy to be adopted by the body with respect to [the Adams Outdoor] litigation," Dkt. 17-4, at 3, the changes had no implications for the way that Adams is regulated.

The bottom line is that there are few meaningful differences between the 1990 version and present version of the city's sign ordinance for the purpose of this case. With the exception of the 2009 amendment related to digital signs, the court concludes that Adams Outdoor's claims in this case meet all of the elements for claim preclusion.

---

[4] The amendment changed the ordinance text as follows:

> Advertising Sign. A sign containing a commercial or noncommercial message directing attention to a business, commodity, service, political candidate or cause, public service, social cause, charity, community affair or entertainment, not related to the premises at which the sign is located, or directing attention to a business, commodity, service or entertainment conducted, sold or offered elsewhere than on the premises where the sign is located. Advertising appearing on public transportation vehicles, signs authorized on Madison Transit Utility bus shelters under Sec. 3.14(4)(i), and sSigns on City-sponsored bicycle-sharing facilities and the bicycles provided as part of a city-sponsored bicycle-sharing program located in the right-of-way or on other City lands in compliance with Sec. 10.33 are not advertising signs as defined herein and are not regulated by this ordinance.

Dkt. 17-4, at 5.

### 3. Potential exceptions to claim preclusion

Alternatively, Adams Outdoor asks the court to make an exception to the claim preclusion doctrine. It offers two reasons: (1) First Amendment law has changed since 1993; and (2) its 1990 lawsuit was a request for a declaratory judgment, and claim preclusion doesn't apply to such cases. The court rejects both reasons.

### a. Change in the law

Adams Outdoor asks the court not to apply claim preclusion because of changes in First Amendment law since 1993, most notably *Reed v. Town of Gilbert*, in which the Supreme Court applied strict scrutiny to a town's rules governing noncommercial signs. Adams Outdoor contends that it would be "inequitable" to apply claim preclusion when the standards for evaluating the constitutionality of sign restrictions have changed so much. Dkt. 102, at 16. As the court will discuss below when it addresses the merits of Adams Outdoor's claims, *Reed* hasn't changed the law of billboard regulation as much as Adams Outdoor suggests. Regardless, the court isn't persuaded that a change in the law is a valid basis to avoid claim preclusion under Wisconsin law.

"[C]ases admitting exceptions to [claim preclusion] are rare." *Patzer v. Board of Regents*, 763 F.2d 851, 856 (7th Cir. 1985) (applying Wisconsin law). There is no "fairness" exception to the doctrine, and it is "strictly applied" in Wisconsin. *Kruckenberg*, 2005 WI 43, ¶¶ 53–54. Although "[c]laim preclusion may be disregarded in appropriate circumstances when the policies favoring preclusion of a second action are trumped by other significant policies[,] . . . [a]ny exception to claim preclusion . . . must be limited to special circumstances or the exceptions will weaken the values of repose and reliance." *Sopha v. Owens-Corning Fiberglas Corp.*, 230 Wis. 2d 212, 236, 601 N.W.2d 627, 638 (1999).

Neither party cites any decision of the Wisconsin Supreme Court that has considered whether claim preclusion should apply when there are changes in the law. But in a nonprecedential decision, the Wisconsin Court of Appeals relied on *Kruckenberg* to reject "an exception to claim preclusion where an intervening change in the law would likely, if not undisputedly, create a different result than in the prior litigation." *Samuels Recycling Co. v. Cont'l Cas. Co.*, 2006 WI App 78, ¶ 5, 292 Wis. 2d 487, 713 N.W.2d 193 (Ct. App. 2006). That conclusion is consistent with the federal rule. *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981) ("[T]he *res judicata* consequences of a final, unappealed judgment on the merits [are not] altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case.").

Adams Outdoor has not identified a persuasive reason for concluding that the Wisconsin Supreme Court would take a different approach from both the United States Supreme Court and the state court of appeals. Law is constantly evolving, so creating an exception to claim preclusion for changes in the law would substantially undermine the primary purpose of claim preclusion, which is to give the parties certainty about their rights so that they can plan accordingly. *Moitie*, 452 U.S. at 398–99; *Kruckenberg*, 2005 WI 43, ¶ 53.

### b. Declaratory judgment exception

Adams argues that the 1993 stipulated judgment lacks preclusive effect because the lawsuit that led to the judgment sought only declaratory relief. Wisconsin has adopted the rule that "a declaratory judgment is only binding as to matters which were actually decided therein and is not binding to matters which 'might have been litigated' in the proceeding." *Barbian v. Lindner Bros. Trucking Co.*, 106 Wis. 2d 291, 297, 316 N.W.2d 371, 375 (1982); *see also* Restatement (Second) of Judgments § 33 (current version of rule adopted in *Barbian*). But the

Court of Appeals for the Seventh Circuit, interpreting Wisconsin law, has held that this "exception operates only if the plaintiff seeks *solely* declaratory relief in the first proceeding." *Stericycle, Inc. v. City of Delavan*, 120 F.3d 657, 659 (7th Cir. 1997) (emphasis in original) (citing Restatement (Second) of Judgments § 33 cmt. c). Unless and until the Wisconsin Supreme Court says otherwise, this court must follow the ruling in *Stericycle*. *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) (district court must enforce an *Erie* guess of the court of appeals unless a "decision by a state's supreme court terminates [its] authoritative force").

Under *Stericycle*, Adams's assertion that it qualifies for the declaratory judgment exception fails. Although Adams Outdoor sought only declaratory relief in 1990 for the alleged First Amendment violations, Adams sought an injunction for its inverse condemnation claims. Specifically, Adams sought "an order declaring that Madison had taken Adams' property and requiring the commencement of condemnation proceedings by Madison pursuant to Sec. 32.10, Wis. Stats." Dkt. 71-1, at 13; *see also* Dkt. 105-1, at 10 (same). The cited legislative provision allows a property owner "who believes that his or her property has been taken by the government without instituting formal condemnation proceedings . . . to recover just compensation for the taking." *E-L Enterprises, Inc. v. Milwaukee Metro. Sewerage Dist.*, 2010 WI 58, ¶ 36, 326 Wis. 2d 82, 111, 785 N.W.2d 409, 424 (2010). In other words, it provides an avenue to monetary damages, not merely declaratory relief.

Adams Outdoor has failed to show that the court should apply an exception to claim preclusion in this case. The court concludes that Adams Outdoor's claims are barred under the doctrine of claim preclusion, with the exception of its challenge to the 2009 ban on digital signs.

## C.  First Amendment claims

No one disputes that the speech that Adams Outdoor and its customers display on billboards is entitled to some degree of First Amendment protection. The question at issue in this case is how much. Signs "pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation." *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1995). But because sign regulations inevitably restrict some amount of protected speech, courts are often called upon to evaluate whether a proper balance has been struck between a government's legitimate regulatory aims and free expression.

Adams Outdoor contends that the city's billboard restrictions violate the First Amendment for four reasons: (1) they constitute content-based discrimination; (2) they are overbroad; (3) they are unconstitutionally vague; and (4) they impose a prior restraint. The centerpiece of Adams Outdoor's case is that the billboard ban constitutes content-based discrimination. The court starts the analysis there.

### 1.  Content-based regulation

"The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (citations omitted). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226. By contrast, content-neutral restrictions are subject to intermediate scrutiny, meaning that the restrictions must promote a substantial governmental interest that would be achieved less effectively absent the restriction while leaving open ample

alternative channels for communication of the information. *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

As the parties recognize, the case turns primarily on what level of constitutional scrutiny applies. Adams Outdoor devotes the bulk of its briefs to arguing that the billboard regulations are content-based and subject to strict scrutiny, whereas the city contends that the regulations are content-neutral and subject to intermediate scrutiny.

### a. Level of constitutional scrutiny

Adams Outdoor contends that two parts of the city's sign ordinance constitute content-based discrimination subject to strict scrutiny: (1) the restrictions on advertising signs; and (2) the prohibition on digital image signs. Because these challenges implicate distinct issues, the court will separately discuss the standard of review for each one.

### i. Restrictions on advertising signs

Adams Outdoor contends that the sign ordinance's regulation of advertising signs constitutes unconstitutional content-based restriction of speech, both facially and as applied to Adams Outdoor. Its primary argument is that the sign ordinance is content based under the Supreme Court's holding in *Reed v. Town of Gilbert*. Reed was the pastor of a church that held weekly services at various locations, and accordingly the church posted temporary signs announcing the location of that week's services. The church was cited for violating the city's sign code's restrictions on "temporary directional signs relating to a qualifying event." The sign code treated other categories of temporary signs—"ideological signs" and "political signs"— more favorably than the church's temporary signs. The Supreme Court held that these distinctions in the sign code were content based and unconstitutional. 135 S. Ct. at 2224. The Court reasoned that a regulation on speech is content based if the regulation "on its face" draws

distinctions based on the message a speaker conveys: "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and therefore, are subject to strict scrutiny." *Id.* at 2227 (internal citation omitted).

Relying on *Reed*, Adams Outdoor contends that the Madison sign ordinance is content based. It argues that the ordinance's definition of "advertising sign" requires the zoning administrator to assess the sign's content to determine whether the sign contains a "commercial message" that "direct[s] attention" to some thing or place not related to or located on the premises of the sign. Because the ordinance defines "advertising sign" by reference to the type of message being conveyed (that is, commercial messages directing attention off-premises), Adams Outdoor says that the various provisions singling out advertising signs for special restrictions are content based and subject to strict scrutiny under *Reed*.

Adams Outdoor overstates *Reed*'s implications on the regulation of billboards. *Reed* clarified the relevant inquiry for analyzing whether restrictions on noncommercial speech are content based or content neutral. But it didn't purport to change the level of scrutiny applicable to billboard regulations like Madison's, which single out signs for regulation based on (1) whether they contain commercial content, and (2) whether they direct attention on- or off-premises. Under longstanding precedent, regulatory distinctions between commercial and noncommercial speech and between on-premises and off-premises signs are subject to intermediate scrutiny.

In *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*, the Supreme Court held that governments may impose restrictions on commercial speech so long

as those restrictions directly advance a substantial government interest and are not more extensive than necessary to serve that interest. 447 U.S. at 566. The *Reed* majority did not discuss *Central Hudson*, let alone purport to overrule it. Indeed, the only mention of *Central Hudson* in *Reed* is in Justice Breyer's concurring opinion, which discusses commercial speech doctrine in a manner that suggests that it remains good law. *See Reed*, 135 S. Ct. at 2235 (Breyer, J., concurring) (noting that the majority's holding is consistent with the principle that the Court applies "less strict standards to 'commercial speech'" (citing *Central Hudson*, 447 U.S. at 562–63)).

Likewise, in *Metromedia, Inc. v. City of San Diego*, the Supreme Court held that regulations distinguishing between on-premises and off-premises signs were subject to *Central Hudson*'s intermediate-scrutiny standard. 453 U.S. at 507. *Reed* made no mention of *Metromedia* either. In his *Reed* concurrence, Justice Alito listed "[r]ules distinguishing between on-premises and off-premises signs" as an example of the type of "rule[] that would not be content based" under the *Reed* majority's holding. 135 S. Ct. at 2233 (Alito, J., concurring).

*Reed* may create some tension with *Central Hudson* and *Metromedia*. But the concurring opinions of Justices Breyer and Alito, and the absence of any mention of *Central Hudson* and *Metromedia* in the majority opinion, show that these two precedents apply to the regulation of billboards. Regardless of what *Reed* may portend for the Court's future decisions, this court has no authority to disregard a Supreme Court decision that the Court itself has not overruled. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (warning lower courts against concluding that more recent Supreme Court cases "have, by implication, overruled an earlier precedent").

The Seventh Circuit hasn't yet considered what if any implications *Reed* might have for billboard regulation, *see Leibundguth Storage & Van Serv., Inc. v. Vill. of Downers Grove*, 939 F.3d

859, 860 (7th Cir. 2019), but other courts have. So far, even after *Reed*, courts have universally concluded that billboard regulations are still governed by *Central Hudson*.[5] And for the most part, courts considering the constitutionality of on-premises versus off-premises distinctions since *Reed* have concluded that such distinctions remain subject to intermediate scrutiny under *Metromedia*. *See, e.g., Adams Outdoor Advert. Ltd. P'ship by Adams Outdoor GP, LLC v. Pennsylvania Dep't of Transportation*, 930 F.3d 199, 207 n.1 (3d Cir. 2019); *Reagan Nat'l Advertising of Austin, Inc.*, 377 F. Supp. 3d at 681; *Citizens for Free Speech, LLC v. Cty. of Alameda*, 114 F. Supp. 3d 952, 968–69 (N.D. Cal. 2015).

The only exception of which the court is aware is *Thomas v. Bright*, 937 F.3d 721 (6th Cir. 2019), in which the Sixth Circuit relied on *Reed* to invalidate an ordinance that permitted on-premises signs but banned off-premises signs. But *Thomas* involved an as-applied challenge by a plaintiff who wished to display *noncommercial* speech on an off-premises sign, so its facts were more akin to those of *Reed* rather than to the facts of this case. The court will follow the majority approach and apply the standard in *Central Hudson* and *Metromedia* to Adams Outdoor's challenge to the ordinance's billboard restrictions.

As a separate argument for applying strict scrutiny, Adams Outdoor contends that the ordinance privileges commercial speech over noncommercial speech in a manner contrary to the plurality holding in *Metromedia*. In *Metromedia*, the Supreme Court analyzed a city

---

[5] *See, e.g., Contest Promotions, LLC v. City and Cty. of San Francisco*, 874 F.3d 597, 601 (9th Cir. 2017); *Reagan Nat'l Advertising of Austin, Inc. v. City of Austin*, 377 F. Supp. 3d 670, 681 (W.D. Tex. 2019); *Reagan Nat'l Advertising of Austin, Inc. v. City of Cedar Park*, 343 F. Supp. 3d 674, 679 (W.D. Tex. 2018); *GEFT Outdoor LLC v. Consol. City of Indianapolis & Cty. of Marion, Ind.*, 187 F. Supp. 3d 1002, 1016–17 (S.D. Ind. 2016); *Peterson v. Vill. Of Downers Grove*, 150 F. Supp. 3d 910, 928–29 (N.D. Ill. 2015), *aff'd on other grounds sub nom. Leihundguth Storage & Van Serv., Inc.*, 939 F.3d 859; *California Outdoor Equity Partners v. City of Corona*, No. CV 15-03172 MMM (AGRx), 2015 WL 4163346, at *9 (C.D. Cal. July 9, 2015).

ordinance that allowed on-premises commercial speech but banned off-premises commercial and noncommercial speech. 453 U.S. at 493–96. A majority of the Court upheld the regulation as applied to commercial speech under *Central Hudson*, but a plurality overturned the ordinance as it applied to noncommercial speech, holding that if a city "tolerates billboards at all, it cannot choose to limit their content to commercial messages; the city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages." *Id.* at 513.

Adams Outdoor contends that the Madison ordinance affords more protection to commercial than noncommercial speech. The court is not persuaded, because the ordinance includes a message substitution provision—designed to ensure compliance with *Metromedia*— which provides that "any sign permitted or authorized under th[e] ordinance may contain any noncommercial message in addition to or in lieu of any other message." § 31.04(1)(c). This provision ensures that the ordinance can't disfavor noncommercial speech, because a noncommercial message can go anywhere that a commercial message can. *See GEFT Outdoor*, 187 F. Supp. 3d at 1015–21 (incorporation of similar message substitution provision rendered sign ordinance content neutral and subject to intermediate scrutiny).

Adams Outdoor contends that the ordinance violates *Metromedia* notwithstanding the message substitution provision. It makes something akin to a disparate-impact argument, contending that the ordinance systematically disfavors noncommercial speech because nonprofits have fewer resources to spend on communicating noncommercial messages than their for-profit counterparts. As an example, Adams Outdoor notes that a nonprofit seeking to display a noncommercial message in a high-traffic commercial corridor in Madison wouldn't

be able to erect a new billboard because of the billboard ban. But a commercial business located on a high-traffic commercial corridor can display messages on its on-premises business sign. The nonprofit could also display a message on an on-premises business sign, but that would require the nonprofit to "construct a new office location . . . along those corridors and then construct a business sign that displayed their intended message." Dkt. 96, at 19. Thus, Adams Outdoor says, under the ordinance, building a new office location is "the only way to ensure that the nonprofit . . . can communicate [its] message as effectively as a business owner with an on-premises sign." *Id.*

But this example shows only that speakers with more resources will have an easier time conveying speech. It does not demonstrate that the ordinance has any inherent tendency to privilege commercial speech over noncommercial speech, like the provision at issue in *Metromedia* did. That some entities may not be able to display as much noncommercial speech as they would like does not render the billboard ban unconstitutional under *Metromedia*. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981).

The court concludes that those provision of the Madison ordinance that restrict billboards are subject to intermediate scrutiny, as articulated in *Central Hudson* and applied to similar regulations in *Metromedia*.

### ii. Prohibition on digital image signs

Under § 31.03(2), "digital image sign" is defined as "[a] sign, any portion of which displays . . . digital images, produced by technology such as LED (light emitting diode) or LCD (liquid crystal display) display screens, plasma, high-definition, interactive touch-screen, or

other such technology." Adams Outdoor contends that the city's ban on digital image signs, § 31.045(3)(i), is also content based and subject to strict scrutiny, even though digital image signs are defined in terms of the technology they employ rather than the messages they convey.

Adams Outdoor's argument rests on the distinction between "digital image signs" and "electronic changeable copy signs." Electronic changeable copy signs have electronically illuminated scrolling or moving messages (think of the time and temperature displays once common on banks). Digital image signs are banned entirely by the ordinance, but electronic changeable copy signs are permitted in a few locations: on wall, roof, above-roof, ground, projecting, or canopy signs. § 31.046(1). According to Adams Outdoor, "the practical effect of this dichotomy is to prohibit owners of Advertising Signs, such as Adams, from using electronic sign technology to convey *any* message (i.e., commercial or noncommercial) whatsoever." Dkt. 62, at 37. Thus, Adams Outdoor says, "these provisions, in combination with the Ordinance's restrictive regulations on 'Advertising Signs,' amount to a content-based restriction on speech that discriminates against the messages conveyed through off-premises signs (i.e., Advertising Signs), and in favor of messages conveyed through other on-premises signs permitted under the Ordinance." *Id.*

This is not what it means to be "content based." The ordinance prohibits digital images on all signs, not just billboards. Electronic changeable copy signs are permitted on a few types of on-premises signs. Both rules apply without reference to a sign's "message, its ideas, its subject matter, or its content," so it is content neutral. *Reed*, 135 S. Ct. at 2226. Adams Outdoor's argument about digital image signs is, at its core, another iteration of its argument that the distinction between on-premises and off-premises is a content-based distinction that must be subject to strict scrutiny. The court rejects this iteration, too.

The ban on digital image signs is evaluated using the intermediate scrutiny applicable to content-neutral time, place, and manner restrictions. To survive a constitutional challenge under that standard, the regulation "must be justified without reference to the content or viewpoint of speech, must serve a significant government interest, and must leave open ample channels for communication." *Leibundguth*, 939 F.3d at 862 (citing *Clark v. Comm. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

To summarize the discussion of the level of constitutional scrutiny, the court will evaluate the challenged provisions of the Madison ordinance under intermediate scrutiny. The court starts with the billboard regulations, to which it applies the principles of *Central Hudson*. It then turns to the digital image sign ban, which it analyzes as a content-neutral time, place, and manner regulation.

### b. Madison's billboard regulations are constitutional under *Central Hudson*

*Central Hudson* sets out the framework for determining whether restrictions on commercial speech are valid under the First Amendment. First, to be entitled to constitutional protection at all, the speech at issue may not concern unlawful activity or be misleading. If the speech satisfies this requirement, then the burden falls on the city to show that: (1) its asserted interest in regulating the speech is "substantial," (2) its regulation "directly advances" the government's asserted interest; and (3) its regulation is "not more extensive than is necessary to serve that interest." 447 U.S. at 566.

For purposes of summary judgment, the city doesn't dispute that the speech at issue in this case is entitled to First Amendment protection, so the threshold element is satisfied. Likewise, Adams Outdoor doesn't dispute that the interests the city asserts as a basis for regulating billboards—traffic safety and aesthetics—are "substantial" for purposes of the

*Central Hudson* analysis. It is well settled that they are. *See Metromedia*, 453 U.S. at 508 ("Nor can there be substantial doubt that the twin goals that the ordinance seeks to further—traffic safety and the appearance of the city—are substantial government goals."). But the parties dispute the remaining two elements: whether the billboard ban and other ordinance provisions singling out advertising signs for stricter regulation directly advance the city's interests in traffic safety and aesthetics and, if so, whether those restrictions are appropriately tailored to those interests.

### i. Direct advancement of government interests

The city contends that its billboard-specific restrictions directly advance both its interest in traffic safety and its interest in aesthetics. Adams Outdoor disagrees, contending that the city has failed to adduce concrete empirical evidence that billboards are unsightly, or that the ordinance makes the roads safer.

The city adduces the expert report of Jerry Wachtel, a certified professional ergonomist with extensive experience in the study of roadside billboards and driver distraction. Dkt. 31. Wachtel's bottom line is that, according to the clear consensus of research, "[a]ll billboards may distract drivers, but digital billboards are worse." *Id*. at 4. Wachtel cites numerous provisions in the Madison ordinance that advance safety by reducing distraction or the obstruction of driver vision. Adams Outdoor counters with its own expert, Barry Strauch, who opines that the risk of distraction from billboards, including digital billboards, can be mitigated to an acceptable level without prohibiting them.[6] Dkt. 111.

---

[6] The court notes that the Strauch report was filed after summary judgment briefing, and thus neither side mentioned it.

If the question before the court were whether specific provisions of the Madison ordinance were justified by sound research on traffic safety, the court would deem the matter to be disputed. But the question is whether the Madison ordinance directly advances the city's interest in traffic safety, not whether each provision is absolutely necessary. Adams Outdoor cannot show that the ordinance is unconstitutional by challenging the regulations as unwise. The Wachtel report is enough to show that Madison's sign ordinance directly advances the city's interests in traffic safety, even if Strauch disputes some of Wachtel's opinions. Adams Outdoor could address this evidentiary argument to the city council, but it is not material to this case.

The Supreme Court hasn't required municipalities to present any supporting data in cases involving sign regulations. For example, in *Metromedia*, the Court determined that an across-the-board ban on billboards "would be proper, given the ability of billboards to distract drivers," and "did not require proof of this effect in the record." *Luce v. Town of Campbell, Wisconsin*, 872 F.3d 512, 516 (7th Cir. 2017) (citing *Metromedia*, 453 U.S. at 508–12, 541, 559–61, 569–70). The Seventh Circuit has taken the same approach in analyzing asserted traffic-safety justifications for sign regulations. *See id.* at 517 ("It does not take a double-blind empirical study, or a linear regression analysis, to know that the presence of overhead signs and banners is bound to cause some drivers to slow down in order to read the sign before passing it."); *Lavey v. City of Two Rivers*, 171 F.3d 1110, 1114–16 (7th Cir. 1999) (court considered no empirical evidence in holding that stricter requirements for off-premises signs directly advanced government's interest in traffic safety).

The billboard restrictions also directly advance the city's interest in aesthetics. "It is not speculative to recognize that billboards by their very nature, wherever located and however

constructed, can be perceived as an 'esthetic harm.'" *Metromedia*, 453 U.S. at 510. Adams Outdoor faults the city for failing to offer specific evidence that the billboard restrictions directly advance its aesthetic interests. But aesthetic judgments are "necessarily subjective" and "defy[] objective evaluation." *Id.* As the Seventh Circuit recently emphasized, "[t]here's no accounting for taste. People's aesthetic reactions are what they are," and the government "need not try to prove that [those] aesthetic judgments are right." *Leibundguth*, 939 F.3d at 862 (internal alterations and quotation marks omitted). Neither the Supreme Court nor the Seventh Circuit requires governments to provide polling data or other empirical support to validate commonsense intuitions about the aesthetic concerns that billboards present.

The court concludes that the ordinance's restrictions on advertising signs directly advance the city's interests in traffic safety and aesthetics.

### ii. Reasonable fit between restrictions and the city's asserted interests

The last element of the *Central Hudson* analysis is whether the city's restrictions on billboards are more extensive than necessary to advance the city's asserted interests. To satisfy this element, the city does not need to show that its restrictions are "the least restrictive means conceivable." *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999). Rather, the city need only show "a 'fit' between the legislature's ends and the means chosen to accomplish those ends, a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995) (citations and quotation marks omitted).

The city has made this showing. In *Metromedia*, the Court held that "[i]f the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then

obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them." 453 U.S. at 508. This holding controls here. In an effort to distinguish *Metromedia*, Adams Outdoor notes that the ordinance at issue in that case didn't contemplate "a total prohibition on outdoor advertising." *Id.* at 515 n.20. But neither does the Madison ordinance. Adams Outdoor still maintains 186 billboard faces in the city, and the ordinance continues to permit outdoor commercial and noncommercial speech on a variety of other types of signs. The ordinance in no way "foreclose[s] an entire medium of expression" in the sense deemed constitutionally problematic by the Supreme Court in other contexts. *See Gilleo*, 512 U.S. at 55 (collecting cases).

This analysis is likewise fatal to Adams Outdoor's overbreadth claim. (Adams Outdoor frames its overbreadth claim as a separate challenge, but the overbreadth analysis dovetails with the final element of the *Central Hudson* analysis, so the court addresses in this context.) Adams Outdoor contends that the ordinance is unconstitutional "because it seeks to prohibit such a broad range of protected [speech] that it is unconstitutionally 'overbroad.'" *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984). "An overbroad statute is one that is designed to burden or punish activities that are not constitutionally protected, but that includes within its scope activities that are protected by the First Amendment." *Gaylor v. Thompson*, 939 F. Supp. 1363, 1373 (W.D. Wis. 1996). For an overbreadth challenge to prevail, "a statute's overbreadth must be '*substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.'" *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 476 (7th Cir. 2012) (emphasis in original) (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)).

Adams Outdoor's overbreadth challenge cannot be reconciled with the *Metromedia* majority's holding that governments may constitutionally ban off-premises commercial signs. Adams Outdoor argues that a substantial proportion of the ordinance's applications, both before and after the 2017 amendment, run afoul of *Metromedia* by privileging commercial speech over noncommercial speech. But as discussed above, the ordinance's message substitution provision ensures that noncommercial speech is always treated at least as well as commercial speech. In light of that provision, Adams Outdoor can't demonstrate that *any* applications of the ordinance violate *Metromedia*, let alone the substantial proportion that would be required to render the ordinance unconstitutionally overbroad. So Adams Outdoor's overbreadth claim fails.

### c. The digital image sign ban is constitutional as a content-neutral time, place, and manner regulation

Adams Outdoor contends that the ban on digital image signs is unconstitutional even if it is evaluated under the intermediate standard of scrutiny typically applied to content-neutral time, place, and manner restrictions. Under that standard, a time, place, and manner restriction will survive constitutional scrutiny if it is (1) content-neutral; (2) not substantially broader than necessary to a serve a significant government interest; and (3) leaves open ample alternative channels of communication. *See Cmty. for Creative Non-Violence*, 468 U.S. at 293.

The city easily makes this showing here, for reasons already discussed in the *Central Hudson* analysis. Adams Outdoor contends again that the city hasn't offered sufficient evidence to demonstrate "how or why . . . static billboards or Electronic Changeable Copy signs are more aesthetically palatable or safe than digital billboards." Dkt. 62, at 42. But the Supreme Court has "never suggested that empirical support is required for *all* time, place, and manner limits." *Luce*, 872 F.3d at 516. Here, the traffic-safety and aesthetic concerns associated with digital

image signs are obvious, even without empirical confirmation from an expert. Large, glowing billboard signs are more eye-catching and distracting—and hence more of an aesthetic eye sore—than conventional billboards or electronic changeable copy signs (which are subject to strict time, place, and manner restrictions under the ordinance, *see* § 31.046(1)). And even if empirical evidence were required to support this commonsense intuition, Wachtel's expert report provides it. *See* Dkt. 31, at 2–4 (providing overview of research literature on digital sign technology and opining that the "research in general, and, in particular the most recent research, is in strong agreement that digital billboards have an adverse effect on traffic safety"). Adams Outdoor says that the ban on digital image signs "in combination with the City's ban on static billboards as a general matter, suppresses an entire mode of communication that is protected under the First Amendment." Dkt. 62, at 41. But as noted above, Adams Outdoor still has 186 billboard faces in the city, and there are numerous other types of signs permitted under the ordinance on which one can display commercial or noncommercial speech.

The city has satisfied its burden to show that its ban on digital image signs is content neutral and not substantially broader than necessary to a serve its asserted interests, and that it leaves open ample alternative channels of communication. So Adams Outdoor's challenge to the digital image sign ban fails as well.

### 2. Vagueness

Adams Outdoor also contends that various aspects of the ordinance are void for vagueness. Due process requires that laws clearly define what they proscribe. *Karlin v. Foust*, 188 F.3d 446, 458 (7th Cir. 1999) (citing *Grayned v. City of Rockford*, 408 U.S. 104 (1972)). To avoid unconstitutional vagueness, a law must both give people "a reasonable opportunity to know what is prohibited" and provide "explicit standards" for those tasked with enforcing

the law to apply. *Grayned*, 408 U.S. at 108. Laws that interfere with the exercise of constitutionally protected rights, such as the right of free speech, are subject to "a more stringent vagueness test," under which courts may invalidate laws as void for vagueness even if they are not impermissibly vague in all of their applications. *Karlin*, 188 F.3d at 458, 458 n.7.

That said, due process doesn't require mathematical precision: "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward*, 491 U.S. at 794. Naturally "there are limitations in the English language with respect to being both specific and manageably brief." *Anderson v. Milwaukee Cty.*, 433 F.3d 975, 978 (7th Cir. 2006) (quoting *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 578–79 (1973)). Courts will typically reject vagueness challenges when an "ordinary person exercising ordinary common sense" would understand what the language in the government proscription at issue means. *Nat'l Ass'n of Letter Carriers*, 413 U.S. at 479.

Here, Adams Outdoor points to numerous provisions of the sign ordinance that it says are void for vagueness. Its challenges fall into two general categories: provisions that fail to sufficiently define key terms, and provisions that vest the zoning administrator with excessive discretion.

a. **Failure to define key terms**

Adams Outdoor points to various terms in the ordinance that it says are insufficiently defined and fail to provide sign owners with adequate notice of what's prohibited. For instance, Adams Outdoor contends that both the original and amended versions of the ordinance fail to sufficiently define the terms "commercial message" and "noncommercial message." Under the original ordinance, "commercial message" was defined as a "message that directs attention to a business, commodity, service or entertainment enterprise which is intended to produce a

monetary profit or earnings which may lawfully inure to the benefit of any private shareholder or individual . . ." Dkt. 75-1, at 7. "Noncommercial message" was defined as a "message intended to direct attention to a political, social, community or public service issue, event, or cause, not intended to produce a monetary profit or earnings which may lawfully inure to the benefit of any private shareholder or individual . . ." *Id.* at 10. The amended ordinance excises these definitions and leaves both terms undefined, on the theory that they are adequately "defined by caselaw." *See* Dkt. 75-2, at 2–3 (drafter's analysis). Adams Outdoor contends that the original ordinance's definitions were vague as to whether the "inten[tion] to produce a monetary profit or earnings" should be ascribed to the owner of the advertising sign, or to the entity whose message is displayed on the advertising sign:

> For instance, the owner of an Advertising Sign could donate space to a community organization, which may in turn display a message regarding a fundraiser that it is conducting. Under the terms of the Ordinance, it is unclear whether the message would be "commercial" (i.e., because it is intended to produce earnings for the organization) or "noncommercial" (i.e., because the owner of the sign donated the space for free).

Dkt. 62, at 50–51. The amended ordinance does nothing to correct this problem, Adams Outdoor says, because it fails to define the terms entirely.

A commonsense reading of the ordinance obviates these vagueness concerns. Under both versions of the ordinance, the adjectives "commercial" and "noncommercial" modify the term "message." This indicates that it is the intention behind the message (i.e., whether it proposes a commercial transaction of some kind) that determines whether the message is commercial or noncommercial, rather than the manner in which the message came to be displayed on the billboard (i.e., paid for by the customer versus donated by Adams). That the amended ordinance omits specific definitions for these terms does not render the terms vague.

"Commercial advertising has long been well defined by Supreme Court commercial speech doctrine. It constitutes paradigmatic commercial speech because its fundamental purpose is to propose an economic transaction." *Lavey*, 171 F.3d at 1116 (cleaned up) (rejecting vagueness challenge based on ordinance's failure to define "commercial speech" and "noncommercial speech"). The meaning of commercial message and noncommercial message is clear from both the context of the ordinance and the relevant case law, so those terms are not void for vagueness.

Adams Outdoor challenges various other ordinance terms as inadequately defined, but those challenges fare no better. Adams Outdoor notes that under the billboard ban, it is unlawful to "erect, repair, *alter*, relocate, maintain, or change copy, except for signs designated for changeable copy," any sign within the city without first obtaining a permit from the zoning administrator. § 31.41(1)(b) (emphasis Adams Outdoor's). The ordinance defines "alteration" as "[a]ny major change made to an existing sign, other than routine maintenance, painting or change of copy of an existing sign." § 31.03(2). But the ordinance doesn't further define what is meant by the phrases "any major change" or "routine maintenance." Similarly, § 31.045 of the ordinance, which deals with "unsafe and unlawful signs and structures," doesn't define or provide criteria for determining when a sign has been "abandoned" or has become a "traffic hazard."[7] And the provision of the ordinance permitting the zoning administrator to "cause

---

[7] That provision reads, in relevant part:

> All signs and structures shall be *properly maintained and kept in an overall clean, neat state of appearance*. It shall be the responsibility of the permit holder or property owner to maintain signs and structures.

> <u>Abandoned Signs</u>. Signs that *no longer serve the purpose for which they are intended, or are not maintained, or which have been abandoned*, shall

any sign that is a hazard to person or property to be removed summarily and without notice" doesn't define "hazard to person or property." § 31.04(4)(a).

These arguments fail. Legislators cannot predict every potential application of a provision at the time of enactment. The words that legislators use will necessarily be subject to later interpretation as new factual scenarios arise. The sign ordinance need not provide an exhaustive enumeration of every conceivable "major change," type of "routine maintenance," or way that a sign can become "abandoned" or "hazardous" to provide constitutionally adequate guidance. These are commonsense terms susceptible to commonsense application. An unconstitutionally vague statute is vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611 (1971)). "Uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.'" *Cal. Teachers Ass'n v. State*

---

be removed by the most recent permit holder, the property owner, or by the City, at the expense of the property owner and may be charged to the property owner as a special charge.

. . .

Signs Not to Constitute a Traffic Hazard. No sign regulated by this ordinance shall be erected at the intersection of any streets in such a manner as to obstruct free and clear vision as further delineated in other sections of this ordinance; or at any location where, by reason of the position, shape or color, *it may interfere with, obstruct the view of or be confused with any authorized traffic sign, signal, or device*; . . . .

§§ 31.045(2)(a), (2)(b), (3)(b) (emphasis Adams Outdoor's).

*Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001) (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)). The court is satisfied that these aspects of the ordinance are clear enough that a person of ordinary intelligence would understand them, so they are not void for vagueness.

### b. Zoning administrator's discretion

Adams Outdoor also challenges four ordinance provisions that it says vest the zoning administrator with unfettered discretion. First, Adams Outdoor notes that § 31.04(4) of the ordinance provides that "the Zoning Administrator *may* cause any sign that is a hazard to person or property to be removed summarily and without notice," and "*may* refuse to issue a sign permit to any permittee or owner who has failed to pay costs assessed for removal of a hazardous sign" or has otherwise failed to pay a fine, forfeiture, or obey a court order arising out of a violation of the ordinance. § 31.04(4)(a), (5) (emphasis Adams Outdoor's). Adams Outdoor says that the inclusion of the permissive verb "may" means that there are no objective criteria to guide the zoning administrator's determinations about whether a hazardous sign should be removed or future permits withheld from a permittee.

But these provisions do not vest the zoning administrator with discretion to remove a sign or deny a sign permit for vague, unknowable reasons. The reasons for any such removal or denial are plain from the text of the ordinance: a sign may be removed if it constitutes a hazard to person or property, and a permit may be denied if a sign owner fails to pay costs, fines, or forfeitures, or to obey a court order. Permittees are on notice of what they need to do to ensure that their signs aren't removed and their permit applications are granted. That these subsections vest the zoning administrator with discretion to leave up a hazardous sign or issue a sign permit despite a permittee's failure to abide by the ordinance does not render these

provisions void for vagueness. Indeed, they make the ordinance *less* restrictive of speech, not more.

Second, Adams Outdoor contends that § 31.05(2)(b), which governs nonconforming advertising signs, fails to provide objective criteria for the zoning administrator to apply. That subsection provides in relevant part:

> [E]xisting advertising signs may not be restored or reconstructed for any reason, except if damaged or destroyed by fire or other casualty or act of God, and only if the total cost of restoration to the condition in which it was before the occurrence does not exceed fifty percent (50%) of its assessed value *or the cost to replace with a new structure of equal quality*, whichever amount is lower.

(emphasis Adams Outdoor's). Adams Outdoor says that this provision is void for vagueness because it gives the zoning administrator complete discretion to determine the replacement cost of an advertising sign structure of equal quality, with "no guideposts or other metrics to inform his or her decision as to what is considered 'of equal quality.'" Dkt. 62, at 53. In fact, this subsection doesn't vest the zoning administrator with any authority at all. The very next sentence of the provision reads: "The determination of eligibility for restoration or reconstruction in the preceding sentence shall be made by the Urban Design Commission . . ." § 31.05(2)(b). The Urban Design Commission holds hearings on sign permitting matters delegated to it under Chapter 31. *See* Madison Gen. Ordinance § 33.24(4)(j). This means that decisions about whether a damaged or destroyed sign qualifies for restoration under § 31.05(2)(b) are made by a deliberative body after a hearing, not unilaterally by the zoning administrator.

Regardless who is vested with authority to make these determinations, the phrase "of equal quality" is not so vague and indefinite as to provide no meaningful standard. The word "equal" is itself a standard. There may be various metrics for ascertaining "quality," and as

currently written, the ordinance affords the Urban Design Commission flexibility to choose the measure of quality it deems most appropriate in a given case. But the requirement that quality be "equal," in combination with the opportunity for interested parties to participate in the Urban Design Commission's administrative process, is sufficient to allay any vagueness concerns. *Cf. Blackwelder v. Safnauer*, 689 F. Supp. 106, 126–28 (N.D.N.Y. 1988) (in rejecting vagueness challenge to the terms "competent" and "substantially equivalent" in law governing minimum standards of instruction for homeschooled children, court noted that "[a] party's ability to clarify the meaning of a regulation . . . through an administrative process[] can ameliorate any vagueness problems that might otherwise be created by the terms of th[e] regulation.").

The other two ordinance provisions that Adams Outdoor says vest the zoning administrator with too much discretion are not susceptible to vagueness challenges because neither actually proscribes any speech. Section 31.04(1) of the ordinance, which sets out some general interpretive rules, provides that "[i]n their interpretation and application, the provisions of this ordinance shall be held to be the minimum requirements and least intrusive means for the promotion and protection of the public health, safety, and general welfare." Adams Outdoor says that this doesn't provide the zoning administrator with sufficiently definite standards for interpreting and applying the ordinance. But § 31.04(1) poses no actual substantive constraints on signage. Adams Outdoor doesn't explain how it could possibly function as a means of proscribing speech, let alone how its application could yield uncertain results. So it's not susceptible to a void-for-vagueness challenge. *See, e.g., XXL of Ohio, Inc. v. City of Broadview Heights*, 341 F. Supp. 2d 765, 806 n.27 (N.D. Ohio 2004) (rejecting billboard company's vagueness challenge to "stated objectives of the sign ordinance and the

determinations in support of the ordinance" because they "mandate or prohibit nothing"); *cf.*
*Beckles v. United States*, --- U.S. ----, 137 S. Ct. 886 (2017) (advisory Sentencing Guidelines were
not subject to a vagueness challenge because they "do not fix the permissible range of
sentences" but "merely guide the exercise of a court's discretion in choosing an appropriate
sentence").

The same is true of the other challenged provision, § 31.05(2)(c), which allows existing
advertising signs to be relocated on the same site if a highway project of the Wisconsin
Department of Transportation requires it. The subsection provides that "sign[s] realigned
under this provision shall not be subject to applicable setback requirements found elsewhere in
this ordinance, if in the Zoning Administrator's opinion a shorter setback is necessary to
accomplish the realignment." Adams Outdoor says that this provision is unconstitutionally
vague because it "allows the Zoning Administrator to develop his or her own subjective opinion
as to whether a shorter 'setback' is necessary to accomplish the alignment." Dkt. 62, at 53. But
this discretion applies only to the distances between signs and property lines; it doesn't operate
as a prohibition on speech. So § 31.05(2)(c) isn't susceptible to a vagueness challenge either.

The court concludes that Madison's sign ordinance provides adequate notice as to its
prohibitions and sufficiently explicit standards for the zoning administrator to apply. So Adams
Outdoor's vagueness claims fail.

### 3. Prior restraint

Adams Outdoor brings facial and as-applied challenges to the ordinance's permitting
regimes as unconstitutional prior restraints on its speech. A system of prior restraint exists
whenever the government imposes conditions on the expression of ideas and opinions. *Kraimer
v. City of Schofield*, 342 F. Supp. 2d 807, 814 (W.D. Wis. 2004) (*citing Southeastern Promotions,*

*Ltd. v. Conrad*, 420 U.S. 546, 553 (1975)). "Prior restraints are not unconstitutional per se," although there is a "heavy presumption against [their] constitutional validity" where protected speech is concerned. *Southeastern Promotions, Ltd.*, 420 U.S. at 558. As with many other areas of First Amendment doctrine, the standard for determining whether a system of prior restraint is constitutional depends on whether the system is content based or content neutral.

For a content-based permitting regime to survive constitutional scrutiny, it must contain three procedural safeguards: (1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227 (1990) (citing *Freedman v. Maryland*, 380 U.S. 51, 58–60 (1965)). Content-neutral prior restraints, by contrast, need only contain "adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002) (holding that content-neutral municipal park ordinance requiring individuals to obtain permit before conducting events with more than 50 attendees was constitutional despite not meeting *Freedman*'s procedural requirements).

Here, Adams Outdoor challenges two of the sign ordinance's permitting regimes: (1) its general permitting process for all non-exempt signs, § 31.041; and (2) the advertising sign bank program, § 31.112.[8] Adams Outdoor's assertion that these regimes must meet the standards

---

[8] As discussed above, Adams Outdoor's challenge to the ordinance's comprehensive design review process, § 31.043(4), as a prior restraint fails for lack of standing because Adams Outdoor hasn't been injured by that process.

articulated in *Freedman* is incorrect. As explained above, sign regulations that draw distinctions between off-premises commercial signs and other kinds of signs are not considered content based under *Metromedia*. So the court analyzes Adams Outdoor's remaining prior-restraint claims using the standard articulated in *Thomas v. Chicago Park District* rather than the more stringent standard set forth in *Freedman*. Under that standard, the court will uphold the general permitting and advertising sign bank processes unless they lack "adequate standards to guide the official's discretion and render it subject to effective judicial review." *Thomas*, 534 U.S. at 323.

### a. General permitting process

Adams Outdoor contends that the general permitting process established in § 31.041 is unconstitutional because it doesn't impose a reasonable time limit for the zoning administrator to evaluate permit applications, which means that there is no prompt avenue for judicial review. That's not correct. The ordinance makes it "the duty of the Zoning Administrator upon the filing of an application for permit to *promptly examine* such plans and specifications," and if he determines that the permit complies with the ordinance, he "shall *promptly* issue the appropriate permit upon payment of the appropriate fee(s)." § 31.041(4) (emphasis added). Appeals from the denial of a permit must be submitted in writing within 30 days, at which point the Urban Design Commission has 60 days to make a final decision on the permit application. § 31.043(1). Once the Urban Design Commission decides an appeal, the applicant has 30 days to seek judicial review. § 31.043(5). These provisions are sufficient to "render [permitting decisions] subject to effective judicial review." *Thomas*, 534 U.S. at 323. That the ordinance requires the zoning administrator to act "promptly" rather than setting out a specific timeframe in which he must act does not make the regime an unconstitutional prior restraint. *See, e.g.,*

*Granite State Outdoor Advert., Inc. v. City of St. Petersburg*, 348 F.3d 1278, 1282 n.6 (11th Cir. 2003) (holding that "time limits are not *per se* required when the licensing scheme at issue is content-neutral").

Adams Outdoor also contends that the general permitting process fails to provide narrow, objective standards for the zoning administrator to apply in approving or denying sign permits. It alleges three defects in particular. First, Adams Outdoor notes that the ordinance allows the zoning administrator to determine "the form and contents of all applications for permits" under the ordinance. § 31.041(2). Adams Outdoor omits the full sentence, which reads: "The Zoning Administrator shall determine, *consistent with the provisions of this ordinance*, the form and contents of all applications for permits." *Id.* (emphasis added). The zoning administrator may have discretion to design the permit application forms, but his discretion is otherwise cabined by the numerous detailed, objective, and definite criteria that one must meet to obtain a sign permit under the ordinance. The ordinance contains "very particular requirements for signs, including limitations on size, height, location, area, and setback conditions. . . . On [its] face, the sign ordinance[] contain[s] enough specificity to render the decision of whether to grant or deny an application virtually ministerial." *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 623 (6th Cir. 2009).

Second, Adams Outdoor points to language from that same subsection stating that "[w]hen all of the provisions of this ordinance or other ordinances relating to such sign shall have been complied with and when the applicant has paid the required fee for every such application, the permit *may* be granted." § 31.041(2) (emphasis Adams Outdoor's). Adams Outdoor says that the presence of the permissive verb "may" shows that the zoning administrator has unchecked discretion as to whether to issue a permit at all. But a broader

reading of the ordinance shows this to be false. Just two subsections later, § 31.041(4) provides that "if the proposed sign is in compliance with all the requirements of this Ordinance *and any other applicable laws*, [the zoning administrator] *shall* promptly issue the appropriate permit upon payment of the appropriate permit fee(s)." (emphasis added). Read conjunctively with § 31.041(4), the permissive language in § 31.041(2) seems only to give the zoning administrator discretion to grant a sign permit despite an applicant's failure to comply with other applicable laws. Such discretion poses no constitutional problem because it "furthers, rather than constricts, free speech." *Thomas*, 534 U.S. at 325.

Third, Adams Outdoor says that the ordinance vests the zoning administrator with unbridled discretion to revoke a sign permit at any time, citing the subsection that provides: "All rights and privileges acquired under the provisions of this ordinance or any amendment thereto, are mere permits, revocable at any time by the Zoning Administrator . . . ." § 31.041(6). But this aspect of the ordinance contemplates post hoc revocation, not prior restraint, so it's not clear why the constitutional standards articulated in prior-restraint cases like *Thomas* should apply. The provision potentially implicates due process interests, but Adams Outdoor doesn't bring a procedural due process challenge.

The court is not persuaded that these three alleged defects render the ordinance devoid of "adequate standards to guide the [zoning administrator's] decision[s]," *Thomas*, 534 U.S. at 325, so Adams Outdoor's challenge to the general permitting process fails.

### b. Advertising sign bank

Adams Outdoor next contends that the advertising sign bank program (through which owners of advertising signs may apply for a replacement advertising sign when an existing sign gets removed due to redevelopment) is an unconstitutional prior restraint, citing the same set

of issues it raised in challenging the general permitting process. First, it says that the ordinance doesn't provide a prompt avenue for judicial review because there is "no time limit in which the Zoning Administrator must issue a permit for a Replacement Advertising Sign." Dkt. 62, at 62. But sign owners apply for replacement advertising sign permits using the general permitting procedures discussed above. *See* § 31.112(5)(b). The only procedural difference is that the zoning administrator must provide written notice to the alderperson of the district where the replacement advertising sign is proposed to be placed. That alderperson can "request a review by the Common Council within fourteen (14) calendar days of the date of the written notice," at which point the city clerk "shall place the matter on the next available Council agenda for review." § 31.112(5)(c). If the common council votes to deny the replacement advertising sign permit, the aggrieved sign owner "may, within thirty (30) days after the decision is published in the proceedings of the Common Council, commence an action seeking the remedy available by certiorari." *Id.* These are reasonable time limits that render decisions on replacement advertising sign permits subject to effective judicial review, as required under *Thomas*.

Second, Adams Outdoor contends that "because the square footage of the removed sign cannot be banked until the Zoning Administrator 'gives his or her written approval,' the program does not provide narrow, objective standards for the Zoning Administrator to apply in approving or denying an application for [a] Replacement Advertising Sign." Dkt. 62, at 62. But this conclusory argument completely ignores the detailed eligibility criteria set out in various subsections of § 31.112. *See* § 31.112(2), (4), (5), (6).

The court discerns no constitutional problem with the advertising sign bank program, so Adams Outdoor's challenge to that aspect of the ordinance fails as well.

### 4. Fourteenth Amendment equal protection claims

Adams Outdoor makes a separate claim under the Equal Protection Clause, on the theory that any law that jeopardizes the exercise of a fundamental right is subject to heightened judicial scrutiny under the Fourteenth Amendment. *See Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006) ("Heightened scrutiny . . . is appropriate when government action interferes with a person's fundamental rights, such as freedom of speech or religion."). But its claim merely repackages its First Amendment content-based discrimination claim, which fails for all the reasons explained above. Because Adams Outdoor hasn't shown any violation of its First Amendment rights, its redundant equal protection challenge also fails. *See Bogart v. Vermilion Cty.*, 909 F.3d 210, 215 (7th Cir. 2018) (in case involving mirror-image First Amendment and equal protection claims, "the same considerations and evidence that defeat[ed] [plaintiff's] First Amendment claim cause the same claim repackaged under the Equal Protection Clause to fail.").

## D. Conclusion

The court holds that most of Adams Outdoor's challenge to Chapter 31 is claim-precluded by its 1993 stipulated judgment with the city. The only exception is its challenge to the ban on digital image signs, which fails on the merits. Even if Adams Outdoor were not precluded by the 1993 stipulation, its First and Fourteenth Amendment challenges would fail because the distinctions that Chapter 31 draws between on-premises and off-premises commercial signs survive intermediate scrutiny. The court will grant the city's motion for summary judgment and dismiss the case.

ORDER

IT IS ORDERED that:

1. Plaintiff Adams Outdoor Advertising Limited Partnership's motion for partial summary judgment, Dkt. 61, is DENIED.

2. Defendants City of Madison and Matthew Tucker's motion for summary judgment, Dkt, 70, is GRANTED.

3. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered April 7, 2020.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge